UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DEBORAH R. NORAH,**

    **Plaintiff,**

vs.

    **Civil Action 2:11-cv-00250**
    **Judge Algenon L. Marbley**
    **Magistrate Judge E.A. Preston Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiff, Deborah R. Norah, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits and supplemental security income. Plaintiff filed her applications for benefits on March 21, 2007, alleging that she has been disabled since January 1, 2007. Plaintiff alleges disability as a result of back pain, depression, and mood swings. (R. at 148, 164.)

After initial administrative denials of her claim, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on March 15, 2010. (R. at 40–66.) A vocational expert also appeared and testified. (R. at 66-68.) On May 25, 2010, the ALJ issued a decision finding that Plaintiff was not disabled. (R. at 18-31.) On December 30, 2010, the Appeals Council advised Plaintiff that it granted Plaintiff's request for review. (R. at 8-11.) On February 24, 2011, the Appeals Council rendered its final decision finding that Plaintiff was not

disabled. (R. at 4-6.) In reaching this decision, the Appeals Council relied primarily on the ALJ's findings. (*See id.*)

Plaintiff thereafter timely commenced this civil action. In her Statement of Errors, Plaintiff contends that the ALJ and Appeals Council erred in considering whether she met Listing 12.05C for mental retardation within 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff also contends that the ALJ and Appeals Council failed to recognize the full extent of her mental limitations in assessing her residual functional capacity. Following the Commissioner's Memorandum in Opposition, the matter is now ripe for decision. For the reasons that follow, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## II. PLAINTIFF'S TESTIMONY

Plaintiff was forty six years old at the time of the administrative hearing. (R. at 40.) She has a tenth grade education. (*Id.*) She stated, however, that she was in special education classes that began after she flunked the first grade. (R. at 40, 62.) Plaintiff testified that she tried to obtain her GED, but was unable to do so because of her "mental capability." (R. at 54.) Plaintiff testified that she was able to write and read, but suggested that she struggled with reading. (R. at 40, 65.) She could write and read a grocery list, but always forgot something on it. (R. at 40-41.) Plaintiff reported that she could not count change and when she worked at McDonald's she did not operate the cash register. (R. at 41.) Plaintiff said that she passed a written driving exam two years earlier, but just barely. (R. at 61.)

Plaintiff testified that she was unable to work because of pain in her hands and arms. (R. at 43.) She also reported pain in her knees and back. (R. at 47–49.) Plaintiff stopped working at McDonald's a year before the hearing because she was in pain and was frequently having to

leave work early. (R. at 44.)

Plaintiff noted that her concentration and short-term memory were poor. (R. at 54.) Plaintiff stated that she experiences crying spells three or four times per week and frequently thought about "ending it all." (R. at 52–53.) She reported that she becomes nervous around other people. (R. at 54.) Plaintiff stated that she passed her days by "look[ing] at educational programs or read[ing] a book." (R. at 59.) She used to write poetry but pain in her hands forced her to stop. (R. at 65-66.) She noted that she read the Bible or a GED book. (R. at 65.) Plaintiff reported driving occasionally and going to the store. (R. at 56, 66.) She was able to clean dishes, cook, and do small amounts of laundry. (R. at 58.)

### III. MEDICAL RECORDS[1]

A.  Lee Howard, Ph.D.

Psychologist, Lee Howard, Ph.D., examined Plaintiff on August 21, 2007. (R. at 255–64.) Plaintiff complained that she was depressed, noting that she felt depressed approximately twice a week for a period of "a few hours." (R. at 256.) She reported depression for the past four years. (*Id.*). Plaintiff noted that she had received a past psychological evaluation, but had not received any follow-up treatment. (*Id.*)

Plaintiff reported that she failed first grade and was in special education for reading in the second grade. (R. at 257-58.) She was able to read and write and completed the tenth grade. (R.

---

[1] The undersigned recognizes that Plaintiff alleges disability in part because of her physical impairments. The medical records indicate that Plaintiff has received treatment for various conditions including a cyst in her left wrist. Both the ALJ and the Appeals Council assigned exertional limitations due to these conditions. Plaintiff's Statement of Errors, however, focuses primarily on Plaintiff's mental impairments and limitations. Accordingly, the Court will focus its review of the medical evidence on Plaintiff's mental impairments and limitations.

at 257.)  At the time of the evaluation, Plaintiff was working part-time at McDonald's.  (R. at 258.)   Her interests were writing and her grandchildren.  (*Id.*). She performed housework once a week, cooked twice per day, drove twice per week, and occasionally attended church.  (*Id.*)  Plaintiff reported crying spells, suicidal ideation the night before the examination, and one suicide attempt in the remote past.  (R. at 259.)  She denied any current imminent intent.  (*Id.*)  Plaintiff also described bipolar symptomatology and stated that she has a low energy level.  (R. at 260.)

> Dr. Howard found Plaintiff to be "fairly dramatic and histrionic," noting that her complaints contained extensive embellishment.  (*Id.*)  He found Plaintiff's social presentation, speech rate, and vocabulary usage and recognition all to be generally normal.  (*Id.*)  Dr. Howard reported that Plaintiff's thoughts were oriented, relevant, goal-directed, and coherent.  (*Id.*)  Dr. Howard found Plaintiff's immediate memory to be reduced.  (*Id.*)  Her long-term memory was retained for recent—as opposed to remote—events, but reduced overall.  (R. at 261.)  Dr. Howard concluded that Plaintiff's general fund of knowledge was slightly below normal.  (*Id.*)  Finally, Dr. Howard concluded that Plaintiff had a "somewhat limited" ability to think abstractly; that her sustained concentration was variable; and that she was capable of simple arithmetic, but not moderate or complex tasks.  (R. at 261.)

> Dr. Howard diagnosed Plaintiff with a depressive disorder.  (R. at 262.)  He assigned Plaintiff a Global Assessment of Functioning (GAF) score between 75 and 80.[2]  Dr. Howard

---

[2] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR"). A GAF score of between 71 - 80 is indicative of transient and

noted at this time that "[b]orderline range intellectual ability would be his rule-out" diagnosis without the benefit of IQ testing. (R. at 262.) He opined that "Plaintiff retained adaptive functioning and her GAF is not significantly impaired." (R. at 262.) Dr. Howard concluded that Plaintiff's ability to understand and execute simple instructions was slightly below normal. (R. at 263.) He felt that Plaintiff was capable of understanding and executing simple to low moderate tasks. (*Id.*) Dr. Howard concluded Plaintiff could maintain appropriate attention and concentration for the performance of simple tasks. (*Id.*) He also found Plaintiff capable of relating to co-workers, supervisors, and the general public. (*Id.*) Finally, Dr. Howard determined that Plaintiff was capable of responding to work stressors, as indicated by her part-time job at McDonald's. (*Id.*)

B.      Tonnie Hotle, Psy.D.

State agency physician Tonnie Hoyle, Psy.D., performed a "Psychiatric Review Technique" on October 3, 2007, based on Plaintiff's clinical interview with Dr. Howard. (*See* R. at 266–79.) Dr. Hoyle diagnosed Plaintiff with depressive disorder, but found that this condition did not meet Listing 12.04 for affective disorders. (R. at 269.) Dr. Hoyle opined that Plaintiff had no restriction in activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (R. at 276.) Based on Plaintiff's clinical interview and Dr. Howard's findings, Dr. Hoyle ultimately concluded that Plaintiff was "not severely limited by psychological factors." (R. at 278.) On August 5, 2008, John Waddell, Ph.D., affirmed Dr. Hoyle's opinion.

---

expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). *Id.* at 34.

    C.    <u>John L. Tilley, Psy.D.</u>

In September 2008, John Tilley, Psy.D., a clinical psychologist, completed a consultative psychological evaluation on behalf of the Department of Job & Family Services. (R. at 389-99.) Plaintiff reported that her primary barrier to employment was nervousness. (R. at 390.) Plaintiff noted that she dropped out of high school because she had a baby. (*Id.*). She characterized herself as academically deficient and noted she had difficulty with reading and math. (*Id.*) She reported that she was held back in the first grade and believed that she might have been held back one or two other times. (*Id.*) Plaintiff also reported taking special education classes. (*Id.*) At the time of Dr. Tilley's evaluation, Plaintiff was working part time at McDonald's. (*Id.*) She claimed that she could not work full-time because of rheumatoid arthritis. (R. at 391.) She denied having any "substantial interpersonal difficulties with co-workers." (*Id.*)

Dr. Tilley reported that Plaintiff was polite and cooperative during the interview and did not display any marked difficulties with frustration, motivation, or agitation. (R. at 392.) Dr. Tilly found Plaintiff's affect to be within normal limits. (*Id.*) Plaintiff reported that "years ago, she made a suicidal gesture, which involved inflicting some superficial wounds on her wrist." (*Id.*) She described that she became nervous around both new people and large groups of people. (*Id.*)

Dr. Tilley administered the Weschler Adult Intelligence Scale–Third Edition (WAIS-III) test. (R. at 393-94.) Testing revealed a Verbal IQ of 69, a Performance IQ of 83, with Plaintiff's Full Scale IQ was 74. (R. at 394.) Plaintiff's verbal score was in the extremely low range, her full scale score was in the borderline range, and her performance score was in the low average range. (*Id.*) Academic testing established reading at the 7th grade level, numerical

operations at the 2nd grade level, and spelling at the 3rd grade level. (*Id.*)

Dr. Tilley diagnosed Plaintiff with borderline intellectual functioning, anxiety disorder, and depressive disorder. (R. at 396.) He assigned Plaintiff a GAF of 70.[3] Dr. Tilley opined that "[f]rom a purely psychological perspective the patient is employable." (R. at 396.) He elaborated that Plaintiff's borderline intellectual functioning and commensurate academic deficits would limit her "occupational options to a degree" but would "not serve as a terminal barrier to future employability." (*Id.*) Finally, Dr. Tilly completed a checkmark sheet in which he assessed Plaintiff's mental functional capacity. (R. at 398.) Dr. Tilly found that Plaintiff was either not significantly limited or had no limitation in every category. (*Id.*) Categories included the ability to get along with co-workers, the ability to sustain an ordinary routine without special supervision, and the ability to carry out detailed instructions. (*Id.*)

D.    Educational Records

The record contains Plaintiff's educational information for grades seven through ten. (R. at 213.) In the seventh and eighth grade, Plaintiff received mostly Cs with a few Bs and Ds. (*Id.*) In the ninth grade, Plaintiff received four Cs and two Ds. (*Id.*) Finally, in the tenth grade, Plaintiff failed nearly all of her classes. (*Id.*)

## IV. EXPERT TESTIMONY

Richard P. Oestreich, Ph.D., testified as a vocational expert at the administrative hearing. (R. at 66–68.) Dr. Oestreich classified Plaintiff's past employment as a housekeeper and a fast food worker as both light and unskilled. (R. at 67.) The ALJ asked the Dr. Oestreich to consider

---

[3] A GAF score of 61-70 indicates that a person has only mild symptoms or some difficulty with social, occupational, or school functioning, but such a person can generally function pretty well and have some meaningful interpersonal relationships. DSM-IV-TR at 34.

a person who was limited to a restricted range of light work and who was limited to simple, repetitive work. (R. at 67.) Based on this hypothetical, Dr. Oestreich testified that such an individual could perform Plaintiff's past relevant work. (R. at 67-68.)

## V. ADMINISTRATIVE DECISIONS

On May 25, 2010, the ALJ issued his decision. (R. at 18-31.) At step one of the sequential evaluation process,[4] the ALJ found that Plaintiff had not performed substantially gainful activity since March 21, 2007. The ALJ found that Plaintiff had the severe impairments of borderline intellectual functioning and cyst in wrist status post excision with good result. (R. at 20.) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) In doing so, the ALJ explicitly considered Listing 12.05C for mental retardation.

---

[4] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

>The ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:
>
>After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(b). Specifically, the claimant can lift and/or carry twenty pounds occasionally and ten pounds frequently. She can sit, stand and/or walk about six hours total in an eight-hour workday. Her ability to push and/or pull (to include operation of both foot and hand controls) is unlimited within the weights described above. She can balance frequently, and occasionally stoop and climb ladders, ropes and scaffolds. She can perform fine and gross manipulation frequently with both upper extremities. The claimant has no visual, communicative or environmental restrictions. As for any nonexertional limitations, the claimant is limited to simple, repetitive tasks.

(R. at 24.) Relying on the Dr. Oestreich's testimony, the ALJ determined that Plaintiff is capable of performing her past relevant work as a housekeeper and fast food worker. (R. at 30.) He therefore concluded that Plaintiff was not disabled. (R. at 31.)

The Appeals Council issued its decision on February 24, 2011. The Appeals Council agreed with the ALJ's findings at steps one through four of the evaluation process, including that Plaintiff was capable of performing her past work. Accordingly, the Appeals Council found that Plaintiff was not disabled within the meaning of the Social Security Act.

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

9

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff challenges the Commissioner's decision on two basic grounds. First, Plaintiff maintains that the ALJ and Appeals Council erred in considering whether Plaintiff met the requirements of Listing 12.05C at step three of the sequential analysis. Second, Plaintiff contends that the RFC assignment did not fully account for her mental limitations.

A.  Listing 12.05C

"At step three of the evaluation process, it is the burden of the claimant to show that he

[or she] meets or equals the listed impairment." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004). Accordingly, "[w]hen a claimant alleges that he [or she] meets or equals a listed impairment, he [or she] must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728.

The United States Court of Appeals for the Sixth Circuit has emphasized that there is no "heightened articulation standard" in considering the listing impairments. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (holding that an ALJ is not obligated to "spell[] out every consideration that went into the step three determination"). Instead, the Court reviews whether substantial evidence supports the ALJ's findings. *See id.* The Sixth Circuit has held, however, that an ALJ's decision must contain sufficient analysis to allow for meaningful judicial review of the listing impairment decision. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (remanding where "[n]o analysis whatsoever was done as to whether [the claimant's] physical impairments . . . met or equaled a Listing under section 1.00"). In remanding for a lack of analysis, the *Reynolds* Court emphasized that it was "possible that the evidence [the claimant] put forth could meet" Listing 1.04. *Id.* at 416.

Another district court has recognized that the requirements for an ALJ's listing impairment analysis are "[not] so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three . . . ." *Staggs v. Astrue*, No. 2:09–cv–00097, 2011 WL 3444014, at *4 (M.D. Tenn. Aug. 8, 2011). Rather, the Sixth Circuit has implicitly acknowledged that a court must read the ALJ's step-three analysis in the context of the entire administrative decision, and may use other portions of a

11

decision to justify the ALJ's step-three analysis.  *See* 165 F. App'x at 411 (finding that an ALJ appropriately considered a claimant's combined impairments at step three in part because "[t]he ALJ described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings").  Various federal courts have acknowledged that other portions of an ALJ's decision may justify his or her step-three conclusions.  *See, e.g.*, *Smith v. Astrue*, No. 11–1574, 2011 WL 6188731, at *1 (4th Cir. Dec. 14, 2011) (using an "ALJ's analysis at subsequent steps of the evaluation" to find that substantial evidence supported the step-three determination); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (holding that an ALJ's findings at step four and five precluded a claimant from qualifying for a listing under step three).

This case specifically involves Listing 12.05C.  To satisfy Listing 12.05C, a claimant must establish the following:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 CFR Pt. 404, Subpt. P, App. 1 § 12.05.  The Sixth Circuit has stressed that Listing 12.05 requires a claimant to establish both the diagnostic description of mental retardation as well as one of the criteria set forth in subdivisions A through D.

To satisfy the diagnostic description, a claimant must demonstrate three factors:

"(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009).  A claimant may meet the onset requirement either directly or circumstantially.  Specifically, the Sixth Circuit has found that "[w]hile the claimant may use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period . . . a claimant is by no means required to produce an IQ score obtained prior to age 22."  *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 699 (6th Cir. 2007).

"The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills."  *Hayes*, 357 F. App'x at 677.  Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."  20 CFR Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). Furthermore, in considering Listing 12.05 the Sixth Circuit has noted "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Id.* (quoting DSM-IV-TR at 49).

The plain language of Listing 12.05 does not identify how severe limitations must be to qualify as "deficits in adaptive functioning."  *Pendleton v. Comm'r of Soc. Sec.*, No. 1:10–cv–650, 2011 WL 7070519, at *11 (S.D. Ohio Dec. 23, 2011).  Nevertheless, case law from the Sixth Circuit and other federal courts, suggests that a claimant must have relatively

13

significant deficits to satisfy the Listing. *See, e.g.*, *West*, 240 F. App'x at 698–99 (6th Cir. 2007) (suggesting that a claimant's ability to understand and retain simple instructions; maintain concentration and attention for basic tasks; interact effectively with co-workers; and deal with work stress all supported a finding of no deficiencies in adaptive functioning); *Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815–16 (11th Cir. 2009) (claimant who did well in special education classes; was able to perform several jobs; and who had mild limitations in daily living activities, social functioning, and concentration did not have the type of deficits in adaptive functioning required for Listing 12.05C); *McMillan v. Comm'r of Soc. Sec.*, No. 1:10–cv–00308, 2012 WL 90264, at *6 (W.D. Mich Jan. 11, 2012) (holding that insignificant or trivial deficits were not sufficient to satisfy Listing 12.05 and ALJ's finding of moderate restrictions in daily living did not require a finding of deficits in adaptive functioning).

Turning to the instant matter, within his step-three analysis, the ALJ described the requirements of Listing 12.05C, including deficits in adaptive functioning. The ALJ found that Plaintiff failed to satisfy Listing 12.05C because "[t]he objective medical evidence fails to show a valid performance or full scale IQ of 60 through 70 before age 22 . . . ." (R. at 24.) This statement implies that a claimant must prove the onset requirement of mental retardation by producing an IQ score taken during the development period. As detailed above, however, claimants may meet the onset requirement either directly or circumstantially, and are not required to provide IQ scores obtained before the development period. To the extent the ALJ imposed this requirement, it was error.

Nevertheless, because other findings within the ALJ's decision justify his Listing 12.05C conclusion, the Court should still affirm the ALJ's decision. *Cf. West*, 240 F. App'x at 698

14

(affirming an ALJ's decision, even though he mistakenly implied that Listing 12.05C required an IQ score before the age of 22, because the claimant failed to produce evidence of deficiencies in adaptive functioning and medical evidence supported the ALJ's conclusion).  Despite the ALJ's imperfect reasoning at step three, he articulated in other portions of his opinion that Plaintiff does not have any adaptive functioning deficits.  Specifically, in finding that Plaintiff had borderline intellectual functioning, the ALJ credited Dr. Howard's conclusion that Plaintiff "did not have any adaptive functioning deficit . . . ."  (R. at 21.)  Furthermore, later in his decision, the ALJ assigned the opinions of Dr. Howard significant weight and emphasized that Dr. Howard's assessment was an accurate representation of Plaintiff's mental status.  (R. at 24–25.)  As the ALJ recognized in his decision, mental retardation requires deficits in adaptive functioning.  Consequently, the ALJ's finding that Plaintiff does not have such deficits served as appropriate grounds for his Listing 12.05C conclusion.[5]

Substantial evidence supports the ALJ's decision that Plaintiff does not have deficits in adaptive functioning.  Following a clinical examination of Plaintiff, Dr. Howard concluded that Plaintiff "retained adaptive functioning . . . ."  (R. at 262.)  The GAF range Dr. Howard assigned Plaintiff, 75-80, suggests no more than slight impairments in functioning.  *See* DSM-IV-TR at 34.  As the ALJ noted, Dr. Tilley also concluded that Plaintiff intellectual impairments "would

---

[5] The ALJ also credited the diagnoses of Drs. Howard and Tilley and found that Plaintiff had borderline intellectual functioning. This conclusion also weighs against a finding that Plaintiff suffered from mental retardation within the meaning of Listing 12.05.  *See Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) (finding substantial evidence that a claimant did not meet the diagnostic description in part because medical sources diagnosed the claimant with borderline intellectual functioning and the record contained no diagnosis of mental retardation).

15

not serve as a terminal barrier to future employment." (R. at 396.)  The GAF score Dr. Tilley assigned, 70, indicates that Plaintiff generally functioned relatively well, with only mild symptoms.  *See* DSM-IV-TR at 34.  Furthermore, Dr. Tilley completed a Mental Functional Capacity Assessment and found that Plaintiff had either no limitations or no significant limitations in every category he considered.  (R. at 398.)  Finally, Plaintiff's own testimony suggests that she was capable of a variety of activities including driving, shopping, cooking, washing dishes, reading, and laundry.  Additionally, Plaintiff continued to perform part-time work well into her alleged disability period.

In maintaining that she satisfies the diagnostic description of Listing 12.05C, Plaintiff stresses her poor academic record.  The undersigned is not persuaded, however, that Plaintiff's academic record, and participation in special education classes, required the ALJ to find her mentally retarded under Listing 12.05.  Plaintiff's academic records reflect that she was able to obtain passing grades, and mostly Cs, until the tenth grade.  Furthermore, the record suggests that Plaintiff's poor performance in tenth grade was at least partially because she had a baby. (*See* R. at 390.)  Under these circumstances, and given the record evidence outlined above, it was reasonable for the ALJ to conclude that Plaintiff did not have deficits in adaptative functioning as required under Listing 12.05C.

B.      Mental Residual Functional Capacity

Within her second contention of error, Plaintiff maintains that the ALJ should have addressed her need for oral instructions and increased supervision within his RFC.  In making this argument Plaintiff contends that the ALJ should have reached such findings based on her verbal IQ score of 69 and the requirements of Social Security Ruling 85-16.

16

> Social Security Ruling 85-16 provides, in pertinent part:
>
> [A]n individual, in whom the only finding in intellectual testing is an IQ between 60 and 69, is ordinarily expected to be able to understand simple oral instructions and to be able to carry out these instructions under somewhat closer supervision than required of an individual with a higher IQ. Similarly, an individual who has an IQ between 70 and 79 should ordinarily be able to carry out these instructions under somewhat less close supervision.

SSR 85-16, 1985 WL 56855, at *3 (1985). The Ruling makes clear, however, that the Commissioner should also consider other evidence, including the observations of medical sources, in assessing a claimant's mental RFC. *Id.* at 4.

Plaintiff's second contention of error is also unavailing. As the plain language of Ruling 85-16 and this Court's past decisions both suggest, Ruling 85-16 does not compel the conclusion that all claimants with an IQ score between 60 and 69 receive RFC limitations of oral instruction and close supervision. *See Delp v. Comm'r of Soc. Sec.*, No. 2:09-cv-460, 2010 WL 3672330, at *4 (S.D. Ohio Sept. 16, 2010) ("Ruling 85-16 does not state that an individual with such a low IQ score always requires 'somewhat closer supervision.'"). Additionally, as Defendant notes, Plaintiff's verbal IQ score of 69 was not the only intellectual testing available. Plaintiff also received a full scale IQ score of 74 and a performance IQ score of 83.

Moreover, the ALJ properly omitted restrictions for oral instruction or close supervision because substantial evidence of record indicated that Plaintiff did not need these accommodations. Although Dr. Howard found Plaintiff capable of understanding and executing instructions within the low to moderate task range, he did not indicate that Plaintiff required oral instruction. Additionally, Dr. Howard found Plaintiff capable of relating to supervisors and did not indicate that Plaintiff required an increased degree of supervision. Dr. Tilley likewise found Plaintiff to be capable of performing simple instructions and not significantly limited in carrying

17

out detailed instructions. Dr. Tilley's mental functional capacity evaluation further indicated that Plaintiff was capable of sustaining an ordinary routine without special supervision. Under these circumstances, the ALJ reasonably accommodated Plaintiff by assigning an RFC limiting her to simple, repetitive tasks.

## VIII. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## IX. NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate

review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   February 13, 2012                        /s/ *Elizabeth A. Preston Deavers*
 Elizabeth A. Preston Deavers
 United States Magistrate Judge